```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF RHODE ISLAND
```

|                              |                    |
|------------------------------|--------------------|
| TIMOTHY PORTER,              |                    |
|     Plaintiff, |              |
|                              |                    |
| v.                           | CIVIL ACTION       |
|                              | NO. 09-606-WGY     |
| AMICA MUTUAL INSURANCE COMPANY, |                 |
|     Defendant. |              |

<u>MEMORANDUM</u>

WILLIAM G. YOUNG, United States District Judge[1]

**I.    INTRODUCTION**

    Timothy Porter ("Porter") was injured when he was struck by a motor vehicle.  The driver of the vehicle was underinsured and Porter received $100,000 in uninsured motorist ("UM") benefits from his automobile insurance policy with Amica Mutual Insurance Company ("Amica").  Porter seeks a declaratory judgment that he is entitled to $300,000 in UM coverage because Amica failed to notify him in a timely manner of the availability of higher UM coverage, as required under Rhode Island General Laws Section 27-7-7.21(d).  Porter also brings a claim for negligence, alleging that Amica failed properly to update his insurance policy per his

---

    [1] Of the District of Massachusetts, sitting by designation.

1

request.  Amica counterclaimed for a declaratory judgment that Porter's UM coverage is but $100,000.  Amica moved for summary judgment in its favor on its counterclaim.

**A.  Procedural Posture**

Porter filed his complaint on October 29, 2009, in the Rhode Island Superior Court for Providence County.  Compl., ECF No. 1-1.  Amica removed the case to the United States District Court for the District of Rhode Island on December 11, 2009, based on diversity jurisdiction.  Notice of Removal, ECF No. 1.

On August 30, 2010, Amica filed the present motion for summary judgment.  Def. Mot. Summ. J.,  ECF No. 11.  Originally assigned to Chief Judge Mary M. Lisi and then to Judge William E. Smith (upon Judge Lisi's recusal), both of the District of Rhode Island, it was reassigned to me on February 9, 2011.  The Court held oral argument on this motion on March 23, 2011, and took the matter under advisement.  On April 1, 2011, the Court denied the motion for summary judgment.  This memorandum explains the Court's reasoning.  See Fed. R. Civ. P. 56(a).

**B.   Facts**[2]

On March 23, 2003, Porter was severely injured when he was

---

[2] For the purpose of this summary judgment motion, the factual summary presented here consists of undisputed facts and disputed facts in the light most favorable to Porter, the non-moving party.  The Court reviews the record as a whole, but "it must disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

2

struck by a motor vehicle while out jogging. Compl. ¶ 4. As a result of the accident, Porter sustained serious and permanent bodily injury and incurred medical expenses, lost wages, and lost earning capacity. Id. ¶ 5.

Porter has maintained automobile insurance with Amica since the mid-1970s. Def. Rule 56 Statement of Facts ("Def. Facts") ¶ 1, ECF No. 12.[3] At all relevant times, Porter's policy included liability coverage for bodily injury in the amount of $300,000 and a provision for UM coverage. Compl. ¶¶ 6-7. For several years prior to 2000, Porter maintained $300,000 in UM coverage. Def. Facts ¶ 2. In July 2000, Porter called Amica to reduce the limits of his UM coverage from $300,000 to $100,000 because he was going through a divorce and was looking for ways to reduce his expenses. Id. ¶ 3; Porter Dep. 36:16-20, July 28, 2010, ECF No. 21. Following this July 2000 phone call, Porter received a confirmation letter dated July 21, 2000, confirming, among other things, that his UM limit was $100,000. Def. Facts ¶¶ 4-5. Porter also received another written communication from Amica, entitled "Important Notice/Amended Declarations," which explained that UM coverage was available in limits of $50,000, $75,000, $100,000, $200,000, $300,000, $500,000, $1,000,000, and $2,000,000, and invited him to contact Amica for more information

---

[3] Citations, as here, to the Defendant's Statement of Facts refer only to those facts admitted by Porter.

about the coverages.  Id. ¶ 6.  Thereafter, Porter called Amica to make other miscellaneous changes to his policy in June, August, and November 2001.  Id. ¶¶ 8, 12, 15.  Following each of these telephone calls, Porter received similar confirmation letters, and nearly identical "Important Notices" and "Amended Declarations" indicating his UM coverage of $100,000 and listing the available UM coverages.  Id. ¶¶ 9-11, 13-14, 16-17.

In late May 2001 and 2002, when Porter's policy was up for renewal, he received renewal notices advising him, among other things, that he "may wish to consider increasing [his] UNINSURED MOTORIST COVERAGE to equal [his] LIABILITY COVERAGE limit of $300,000" for an additional $80 or $86, respectively.  Id. ¶¶ 7, 18.

On March 4, 2003, Porter called Amica to make changes to his policy.  It is undisputed that one of the purposes for this call was to add a new vehicle, a Toyota Tacoma, to his automobile insurance policy. Am. Decl., March 7, 2003, Def. Ex. 4, ECF No. 14-6; Porter Dep. 84:10-12, ECF No. 21-1; Compl. ¶ 11.  It is disputed, however, whether Porter also requested to increase his UM coverage to $300,000 in this same phone call.  Porter alleges that he "requested to restore his coverage to its prior level; that is, back to a $300,000 UM limit."  Pl. Statement of Disputed Facts ("Pl. Facts") ¶ 21, ECF No. 22.  Amica denies that this request was made.  See Ans. & Countercl. ¶¶ 1, 11 (allegations in

4

support of counterclaim), ECF No. 2 .

Porter admits that following the March 4, 2003, phone call, he did again receive two written communications (confirmation letter dated March 4, 2003, and Important Notice/Amended Declarations dated March 7, 2003) from Amica, nearly identical to those sent after he made changes to his policy in 2001.  Pl. Facts ¶ 21.  He asserts, however, that these communications were not received until after his March 23, 2003, accident.  Pl. Facts ¶ 21; Porter Dep. 113:16-116:4.

Porter filed a notice of claim with Amica and Amica paid Porter the sum of $100,000 in uninsured motorist benefits. Compl. ¶ 14.

**II.  ANALYSIS**

    **A.  Legal Standard**

Summary judgment is warranted when the facts, properly supported by the record and taken in the light most favorable to the non-moving party, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" when it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Id.

To defeat a motion for summary judgment, the nonmoving party is required to produce "specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue. [C]onclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal citations and quotation marks omitted). The Court must, however, "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

**B.   Rhode Island General Laws § 27-7-2.1**

This dispute largely turns on the requirements of Rhode Island General Laws Section 27-7-2.1 and its provisions governing UM coverage.

In general, uninsured motorist coverage is designed "to protect persons injured in automobile accidents from losses which, because of the tort-feasor's lack of liability coverage, would otherwise go uncompensated." Gyori v. Johnston Coca-Cola Bottling Grp., Inc., 76 Ohio St. 3d 565, 567 (1996) (quoting Abate v. Pioneer Mut. Cas. Co., 22 Ohio St. 2d 161, 165 (1970)).

In Rhode Island, the requirements for UM coverage are codified in Section 27-7-2.1 of its General Laws. This section

6

requires that every liability insurance policy issued in the state of Rhode Island contain UM coverage. Subsection (a) requires that UM coverage be provided "in an amount equal to the insured's bodily injury liability limits," unless the insured selects a limit lower than this liability limit. In no event may the UM coverage be less than the minimum, currently $25,000, set forth in Section 31-31-7.

Subsection (d), the portion of the statute upon which Porter primarily relies, requires that when an insured selects a lower UM coverage amount, the insurer "notify the policyholder, in any renewal, reinstatement, substitute, amended, altered, modified, transfer, or replacement policy, as to the availability of [higher UM] coverage or optional limits." This offer must "notify the policy holder of the availability of uninsured motorist coverage equal to the liability coverage in the policy." Aetna Cas. & Sur. Co. v. St. Angelo., 615 A.2d 1018, 1018 (R.I. 1992). Such notice enables the insured make an informed decision whether to request such coverage. American Universal Ins. Co. v. Russell, 490 A.2d 60, 62 (R.I. 1985) ("For an insured to reject uninsured-motorist coverage, it must first have been offered.").

Where insurance companies fail to provide such notice, or provide insufficient notice, courts have written UM coverage into the policy by operation of law. See id. The amount of UM coverage written into the policy is generally equal to the

7

policy's coverage for bodily injury.  Fama v. Prudential Prop. & Cas. Ins. Co., 694 A.2d 741, 742 (R.I. 1997); see also Farm Bureau Mut. Ins. Co. v. Jameson, 472 F. Supp. 2d 1272, 1287 (D.N.M. 2006); Dewart v. State Farm Mut. Ins. Co., 296 S.C. 150, 153 (S.C. Ct. App. 1988) ("If the insurer fails to comply with its statutory duty to make a meaningful offer to the insured, the policy will be reformed, by operation of law, to include underinsured motorist coverage up to the limits of liability insurance carried by the insured.").  But see Russell, 490 A.2d at 62 ("We further find that the amount of such [reformed] coverage shall be the minimum amount required under § 27-7-2.1 (which refers to § 31-31-7 for a dollar amount).  The defendant's claim that coverage should be provided to the limits of liability contained in the policy does not persuade us."), abrogated by Fama, 694 A.2d 741); 7 Am. Jur. 2d Auto. Ins. § 45 (noting that if an insurer fails to offer UM coverage, the minimum limits required by statute will be imputed into the policy).

**C.   Count I: Declaratory Judgment**

Porter argued that the Court ought reform his insurance policy by operation of law to reflect $300,000 in coverage because Amica failed timely to notify him of the availability of higher UM coverage, as required by Rhode Island General Laws Section 27-7-2.1(d), after he amended his policy on March 4,

8

2003.[4] Amica argued that the notice was sent to Porter in a timely manner and that reformation is improper.[5] Amica thus asked the Court to rule, as matter of law, that the notice was timely.

### 1. Is Notice Effective Upon Mailing or Receipt?

The initial question is whether timeliness ought be measured from mailing or receipt. This is a question of law and is properly resolved by this Court. Porter would have had the Court require actual notice, and urged that timeliness ought be measured from the point at which the notice is received. Amica, on the other hand, focused on the date that the notices were mailed. Mem. Supp. Def. Mot. Summ. J. 9, ECF No. 13 ("Amica can do nothing more than place the written notification in the mail properly addressed to the insured at his listed mailing address. By mailing the notice, Amica complied with its obligations.").

In support of his argument, Porter relied on Larocque v.

---

[4] Porter challenged only the timing of the notice, not its content or substance.

[5] Amica further argued that the sufficiency of this particular notice is irrelevant because Porter was on notice of the opportunity to upgrade his UM coverage from the "Important Notices" he received with each earlier amendment or renewal of his policy. This argument fails because "[t]he insurer's duty to provide this notice . . . does not depend upon whether the insured has actual or imputed knowledge from previous experience of the right to obtain this higher coverage." Fama, 694 A.2d at 742. Any potentially insufficient statutory notice after the March 4, 2003, telephone call could not, therefore, be cured or ignored simply because sufficient notice had been provided in the past.

R.I. Joint Reinsurance Ass'n., 536 A.2d 529, 531 (R.I. 1988), for the proposition that "[p]ublic policy dictates that the insured receive actual notice of cancellation." Larocque involved cancellation of a fire insurance policy, and the court was charged with interpreting a regulation which required only that the insurance company "give thirty days notice prior to cancellation." Id. at 530. Absent more specific guidance, the Supreme Court of Rhode Island held that actual notice of cancellation better served the policies of the insurance law. Id. at 530-31.

Here, Section 27-7-2.1 requires that the insured "notify the policy holder," and yet neither the statute nor the insurance regulations explicate this requirement of notice. Although there is no clear guidance within the law of UM coverage, the Court notes that the regulation governing cancellation of automobile insurance specifically requires proof of mailing alone. Rhode Island Department of Business Regulation, Division of Insurance, Insurance Regulation 16 §§ 5-6. As this Court is left to deduce the requirements of UM notice from the different law applicable to different types of cancellation notices, the Court is persuaded that Regulation 16 provides a closer analogy than does Larocque. Public policy also convinces this Court that the timeliness of notice of UM coverage limits ought be measured from the time of mailing. It would be illogical to hold insurers to

higher notice requirements for UM limits than for policy cancellations.  If one believes he is insured, and in fact his policy has been cancelled, it is imperative that he learn of the cancellation as soon as practicable so that he may seek out other coverage.  In contrast, notice of higher UM coverage only serves to remind those who have already specifically opted for lower UM coverage of the possibility of increasing their limits.  Though important, the purpose of this notice is less critical than notice of cancellation.

Moreover, it would seem to contravene the cost-containment policy of UM coverage to require insurance companies to ensure actual notice.  Notice of UM coverage limits must be sent whenever an insured renews, reinstates, substitutes, amends, alters, modifies, transfers, or replaces his policy.  For many insurance holders, including Porter, the number of events triggering the UM notice requirement will far exceed the number of policy cancellations.[6]  If insurers were required to pay for a mail service which provides proof of receipt they would undoubtedly pass along these additional costs to customers.

---

[6] For example, Porter has never had his insurance policy with Amica cancelled and yet, in the period 2000-2003 alone, Porter had three renewals and made amendments to his policy on four occasions.  He received at least seven notices of UM coverage limits.  It is true, however, that any insurance holder is potentially subject to cancellation whereas these UM notices need only be sent to the portion of the insured population who have opted for lower UM limits.

There is nothing in the statute or regulations that sets forth a requirement that the insurer prove actual notice of the higher UM limits, and given the policy surrounding UM coverage, the Court refuses to read any such requirement into the law. This Court, therefore, rules that the timeliness of notice under Section 27-7-2.1 ought be measured from the time of mailing, not receipt.

### 2. Was Notice Timely Sent?

Section 27-7-2.1(d) makes no mention of the time within which the insurer must notify the insured, nor does it appear that any Rhode Island court has analyzed the timeliness requirements of this section. The statute states only that "[a]fter the selection of limits by the named insured . . . the insurer . . . shall be required to notify the policyholder, in any renewal, reinstatement, substitute, amended, altered, modified, transfer, or replacement policy, as to the availability of that coverage or optional limits." The temporal references in the statute seem not to clarify the necessary timing of the notice, but rather to indicate only that the notice requirement is triggered when an insured, who has previously selected a lower limit, later amends or otherwise changes his policy.

The purpose of the notice requirement is to give the insured an opportunity to make an informed decision whether to opt for higher UM coverage. In light of this purpose, notice must

12

therefore be provided in time to give the insured an opportunity to increase her coverage. Because an insured is free to call her insurance company at any time and increase her coverage to any level for which she is willing to pay the premium, the timing of the notice is not crucial. But based on the overarching policy of UM coverage – to protect insured motorists from bearing the costs of the negligence of uninsured motorists – it is beneficial to have notices mailed as soon as possible so that motorists can increase their UM coverage if they so choose.

"While any doubtful language in an UM statute should be resolved in favor of the insured, the principle of liberal interpretation should not be applied to give a forced construction or one which inserts a requirement not contained in an UM statute. . . ." 7 Am. Jur. 2d Auto. Ins. § 38. This Court thus ought not read a specific timeliness requirement into the statute where none exists. Instead, the Court rules that notice must be sent within a reasonable time after the event triggering the notice requirement. See Pickering v. American Employers Ins. Co., 109 R.I. 143, 158-59 (1971) (noting that even a provision that notice must be given "immediately" or "as soon as possible" means that notice must be given within a reasonable time under the circumstances of the case); see also Hastings v. United Pac. Ins. Co., 318 N.W.2d 849, 851-52 (Minn. 1982) (ruling that an offer of additional coverage is meaningful, and gives the insured

enough information to make an intelligent decision, if the notification is commercially reasonable); Dewart, 296 S.C. at 153.

Here, it is disputed when the notice was sent. Porter testified at his deposition that he remembered reading the confirmation letter dated March 4, 2003, and the Important Notice/Amended Declarations dated March 7, 2003, while still in the hospital recovering from the accident. He relied primarily on inferences in determining that he did not receive these letters before his March 23, 2003, accident. See Porter Dep. 113:16-116:4. Porter argued that the date of March 7 on the Important Notice/Amended Declarations is not the date that this document was mailed because, had it been, he would have received it before his accident. Pl. Facts ¶ 22.

Amica relied on the dates printed on the letters and on its own business practices to assert that the letters were mailed within a few days of the March 4 telephone call. See Def. Facts ¶ 22; Caswell Dep. 112:2-113:3, July 29, 2010, ECF No. 21-4. Neither party was able to produce any direct proof of mailing.

There remains a genuine issue of material fact as to the date on which the notice was mailed. "[W]hen the facts are disputed or the inferences uncertain, [the question of what is a reasonable time] is a question for the jury." Sherwood Ice Co. v. United States Cas. Co., 100 A. 572, 574 (R.I. 1917), partially

overruled on other grounds by Pickering, 109 R.I. 143.  Amica's motion for summary judgment was therefore denied as to Count I.

### D. Count III: Breach of Contract

In his third cause of action, Porter brought a claim for breach of contract.  He alleged that Amica had a duty under the terms of its insurance contract with Porter to provide insurance coverage as set forth in the terms of the contract and as required by applicable statutes and laws and that Amica breached that contract by failing to provide sufficient notice of UM coverage options.  To succeed on this claim at trial, Porter would need to prove, among other things, that the notice was improper.  Because the timeliness of the notice must be decided by the jury, the Court cannot rule as matter of law that Amica did not breach its contract with Porter.  Amica's motion for summary judgment as to Count III was therefore also denied.

### E. Count II: Negligence

In Count II of his complaint, Porter alleged that Amica was negligent in failing to provide him with notice as required under Section 27-7-2.1(d), thereby denying him the opportunity to amend his UM coverage to $300,000 before his March 23, 2003, accident.  In his brief and at the oral hearing, Porter refocused his negligence claim around the telephone call on March 4, 2003, about which Porter alleged that his request to increase his UM coverage to $300,000 was not memorialized or implemented by Amica

15

and its agents.

Porter claimed that, in February 2003, he learned that he was getting a promotion at work along with a large raise in pay. Porter Dep. 81:4-10. With his increased income, Porter purchased a new Toyota Tacoma on or around March 1, 2003. Id. at 82:9-22. Porter claimed that he called Amica on March 4, 2003, to insure the Tacoma. Id. at 84:10-12. Porter testified that he spoke with Amica customer service representative, Denise Caswell ("Caswell"), and told her that "because of [his] new position at work, financially, [he] was on much better ground; and in addition to getting the Tacoma coverage, [he] wanted to restore the levels of coverage [he] had previous to the time where [he] made the significant changes [due to his divorce] back in 2000." Id. at 84:18-23. Although Porter did not specifically say that he wished to restore his UM coverage to $300,000, he expected that Caswell would refer to his files from 2000 and restore his coverage to those levels, making his UM coverage equal to his $300,000 bodily injury liability coverage. Id. at 86:4-88:18.

Following this telephone call, Amica sent a confirmation letter to Porter, dated March 4, 2003. As noted above, it is disputed when this letter was sent and received. It is undisputed, however, that the coverage confirmation reflects the addition of the Toyota Tacoma to Porter's policy but continues to reflect only $100,000 in UM coverage. Coverage Confirmation, ECF

16

21-5.

Amica alleged that Porter "specifically requested and obtained $100,000 in Uninsured/Underinsured Motorist Bodily Injury coverage" and that "Mr. Porter never requested any change to the $100,000 limit for Uninsured/Underinsured Motorist Bodily Injury coverage." Ans. & Countercl. ¶¶ 1, 11. These claims are supported, generally, by the deposition testimony of Caswell and Mark D. Harrison. See Caswell Dep., ECF Nos. 21-2 to -4 (reviewing and discussing the "Record of telephone conversation, archived document" from Porter's March 4, 2003 call and noting that the only noted purpose of the call was to "add car, lay up coverage for [old car being removed from the account]."); Harrison Dep., ECF No. 21-10.

On Porter's second cause of action, for negligence, it is essential for him to establish that he implicitly or explicitly asked Caswell to increase his UM coverage to $300,000, that she failed to do so, and that as a result, his policy reflected $200,000 less coverage than he ought have had at the time of his March 23, 2003 accident.[7]

---

[7] Porter characterized his second cause of action as sounding in tort for negligence. Actually, it sounds in contract, viz: if Porter proves a meeting of the minds between Caswell and himself concerning increasing UM coverage to $300,000, a contract was formed at that moment as Porter was implicitly promising to pay the increased premium. If Porter proves that Caswell understood Amica was to restore his UM coverage to the level of bodily injury coverage, her standard of performance or lack thereof (tort concepts) are of no moment.

17

There is a genuine dispute as to whether Porter asked Caswell to restore his UM coverage to $300,000. Taking Porter's version of facts as true, and drawing all reasonable inferences in his favor, this Court could not say that Amica, by its agents, was not negligent, and therefore denied Amica's motion for summary judgment on Count II.

### III. CONCLUSION

For the foregoing reasons, Amica's motion for summary judgment was DENIED on April 1, 2011.

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

June 2, 2011

---

Whatever the characterization of the cause of action, however, summary judgment is inappropriate.